UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAWN M. DePOTTEY,

|  |  |
|---|---|
| Plaintiff, | Civil Action No. 13-13305 |
|  | Honorable Bernard A. Friedman |
|  | Magistrate Judge David R. Grand |

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [17, 25]

Plaintiff Dawn M. DePottey ("DePottey") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [17,[1] 25], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

## I.   RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that DePottey is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [25] be GRANTED, DePottey's Motion for Summary Judgment [17] be DENIED, and that,

---

[1] DePottey filed her motion for summary judgment on January 8, 2014. (Doc. #17). On January 9, 2014, after the Commissioner filed additional portions of the administrative transcript, DePottey filed a corrected brief in support of her motion. (Doc. #20). To the extent that the Court refers to arguments advanced by DePottey, it will cite to the applicable sections of her corrected brief.

pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On June 9, 2006, DePottey filed applications for DIB and SSI, alleging a disability onset date of September 1, 2001.  (Tr. 104-12).  These applications were denied initially on October 26, 2006.  (Tr. 54-61).  DePottey filed a timely request for an administrative hearing, and, on July 8, 2009, a notice was mailed to her indicating that her hearing was scheduled for August 6, 2009, before ALJ Elliott Bunce, and would be held via video teleconference.  (Tr. 66-79). DePottey's attorney, John Wildeboer, faxed a letter to ALJ Bunce on July 15, 2009, indicating that DePottey objected to conducting her hearing by video conference and was requesting an in-person hearing.  (Tr. 90-92).  Nevertheless, ALJ Bunce conducted DePottey's administrative hearing via video conference in her absence on August 6, 2009.  (Tr. 31-51).  On September 25, 2009, the ALJ issued a written decision finding that DePottey was not disabled.  (Tr. 11-22).  On August 13, 2010, the Appeals Council denied review.  (Tr. 1-2).

DePottey filed for judicial review of the Appeals Council's final decision on October 26, 2010.  On February 1, 2011, the District Court entered an order, pursuant to the parties' stipulation, reversing the Commissioner's decision and remanding the matter for further administrative proceedings.  (Tr. 741-44).  On November 21, 2011, the Appeals Council issued an order remanding the case to an Administrative Law Judge with directions to (1) offer DePottey an opportunity to appear and testify in person at an administrative hearing; (2) update the current medical records and allow the submission of any additional pertinent evidence; (3) further consider the severity of DePottey's impairments, the symptoms arising from them, and their effect on her ability to work; and (4) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on her occupational base.  (Tr. 750-51).

On remand, a second administrative hearing was held on June 21, 2012, before ALJ Kathleen Eiler. (Tr. 669-702). DePottey, who was still represented by Mr. Wildeboer, appeared in person and testified at the hearing, and the ALJ also heard testimony from vocational expert Michelle Ross. (*Id.*). On September 28, 2012, ALJ Eiler issued a written decision finding that DePottey is not disabled. (Tr. 645-63). On June 7, 2013, the Appeals Council denied review. (Tr. 622-24). DePottey then filed for judicial review of the final decision on August 1, 2013. (Doc. #1).

**B.    Background**

*1.    Disability Reports*

In a June 9, 2006 disability field office report, DePottey reported that her alleged onset date was September 1, 2001. (Tr. 132). The claims examiner noted that, during a face-to-face interview, DePottey "seemed very tired throughout the interview." (Tr. 133).

In an undated disability report, DePottey indicated that her ability to work is limited by chronic pain, carpal tunnel syndrome, and knee, feet, and back "problems." (Tr. 136). DePottey reported that her conditions first interfered with her ability to work in September of 2000; at that point, she was put on "light duty" until her doctor "ordered [her] to stop working" on September 1, 2001. (*Id.*). Prior to stopping work, she worked as a lubrication specialist at a sugar beet processing plant. (Tr. 137). She indicated that she had treated with several providers regarding her impairments and was taking numerous medications. (Tr. 138-43).

In a function report dated July 1, 2006, DePottey reported that she lives in a house with family. (Tr. 150). When asked to describe her daily activities, DePottey indicated that she takes medication and a shower to relax her muscles in the morning, prepares breakfast for her children, and sometimes runs errands. (*Id.*). When asked to describe what she could do before the onset

of her conditions that she can no longer do, DePottey listed heavy lifting, roller skating, bike riding, yard work, and going on long drives. (Tr. 151). She has difficulty sleeping and getting out of the bathtub, and she sometimes needs reminders to take her medication. (Tr. 151-52). DePottey prepares simple meals on a daily basis but no longer cooks "full course meals." (Tr. 152). She is able to do laundry, but she no longer can do yard work or home repairs. (*Id.*). She is able to walk "a little," drive a car, and shop in stores once or twice a month (although she needs help lifting heavy items). (Tr. 153). She is able to pay bills, count change, and handle a checking and savings account. (*Id.*). Her hobbies include watching television and playing sports (although she can no longer play sports because of pain and lack of mobility). (Tr. 154). She spends time with others and attends church twice a month. (*Id.*).

When asked to identify functions impacted by her conditions, DePottey checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, concentration, using her hands, and getting along with others. (*Id.*). She can walk approximately one block before needing to rest, and her attention span depends on her "depressed state." (*Id.*). She has difficulty finishing what she starts and following written instructions, but she can follow spoken instructions. (*Id.*). DePottey gets along well with authority figures and has never been fired from a job because of problems getting along with other people. (Tr. 156). She reported that she sometimes uses a cane and braces for her wrist and knee. (*Id.*).

### 2.    *DePottey's Testimony*

At the June 21, 2012 administrative hearing, DePottey testified that she lives in a house with her three children. (Tr. 672-73). She works part-time (approximately ten hours per week) as a bartender's helper. (Tr. 683). When asked what she does on a daily basis, DePottey testified that she fixes breakfast for her children and sees that they get to school. (Tr. 673).

4

Some days, however, DePottey does not even get out of bed because her back and leg pain is "overwhelming," especially if she has worked the day before.  (Tr. 673-74).  DePottey testified that "more than half" of the time she awakens, she determines that she cannot "get out of bed and stay out of bed."  (Tr. 674).  She also has carpal tunnel syndrome in both hands and has difficulty picking up coins and doing dishes.  (Tr. 686-87).  She has "throbbing" headaches three or four times a week.  (Tr. 687).

DePottey testified that, at times, she has difficulty with self-care, including cleaning herself, getting in and out of the shower, and combing her hair.  (Tr. 674-75).  She does not take the garbage out, and she does not do any yard work because her riding lawnmower is "too bouncy" and it hurts her back.  (Tr. 676-77).  She can fold laundry, but she does not put it away because she gets "exhausted."  (Tr. 678).  DePottey further testified that she cannot sit for more than 15-30 minutes before her legs start to fall asleep.  (Tr. 678-79).  And, when she stands up after sitting for a period of time, she sometimes falls because her feet "don't move like they should."  (Tr. 680-81).  In addition, DePottey testified that, a "couple times a week," she has "breakdowns," including crying episodes and panic attacks.  (Tr. 681).  When these episodes occur, she isolates herself in her room in an effort to calm herself.  (Tr. 681-82).

### 3. Medical Evidence

#### (a) Physical Impairments

The ALJ found that DePottey has the severe physical impairments of degenerative disc disease, carpal tunnel syndrome, and headaches.  (Tr. 648).  Medical evidence pertaining to these conditions is discussed below.

#### (1) Treating Sources

In December 2001, DePottey presented to Dr. Gerald Schell, complaining of back pain

radiating down her legs and had spondylolisthesis at L5-S1.   (Tr. 194).   On examination, DePottey was obese, very uncomfortable, and walked with an antalgic gait.   (*Id.*).   She had positive straight leg raising, absence of ankle reflex, sensory changes in the S1 distribution, and trace weakness of plantar flexors of the right foot.   (*Id.*).   Dr. Schell's impression was "[i]ncapacitating back and bilateral radicular leg pain with a grade 1 spondylolisthesis at the L5 and S1 with exogenous obesity."   (Tr. 195).   As a result, lumbar decompression and fusion surgery was performed on December 27, 2001.   (Tr. 194-95).   X-rays of the lumbar spine performed after surgery showed pedicle screws at L5-S1, which appeared well-seated, and grade 1 spondylolisthesis at L5-S1.   (Tr. 200).   Subsequently, DePottey was discharged in stable condition.  (Tr. 241).

On January 28, 2002, DePottey followed up with Dr. Schell, who noted that her severe nerve pain was gone and that she had made "pretty good progress." (Tr. 223).  An imaging study performed of DePottey's lumbar spine on March 15, 2002, showed degenerative disc disease at L5-S1 and status post wide laminectomy at L5 and L5-S1, with transpedicular screw fixation at L5-S1. (Tr. 233).  On March 25, 2002, Dr. Schell reported to DePottey's primary care physician, Albert Yong, D.O., that DePottey was making "real good progress with good relief of her pain state" and had good strength in her lower extremities.  (Tr. 222).  In July 2002, Dr. Schell wrote a note indicating that DePottey needed to remain off work until September 9, 2002.  (Tr. 221). An imaging study of DePottey's lumbar spine performed on September 5, 2002, showed evidence of prior transpedicular screw placement with marked intervertebral disc space narrowing at L5-S1; however, no spondylolisthesis was identified, and there was no significant interval change when compared to her March 2002 imaging study.  (Tr. 231).

In March 2003, x-rays were again performed of DePottey's lumbar spine.   (Tr. 229).

Notes show a few millimeters of forward positioning of L5 over S1, which was not seen on the September 2002 films, and disc space narrowing at L5-S1.  (*Id.*).  Dr. Schell saw DePottey on March 24, 2003, and indicated that she was "doing well." (Tr. 220).  When DePottey returned to see Dr. Schell on June 11, 2003, he noted that she was having ongoing difficulties with neck, shoulder, and arm pain, and he ordered further diagnostic studies and an EMG of her extremities. (Tr. 218).  The July 2003 EMG results showed mild carpal tunnel syndrome in the bilateral upper extremities, worse on the right than the left, and left C6 radiculopathy with signs of chronic denervation and reinnervation.  (Tr. 235-36).  X-rays of DePottey's lumbar spine performed the same day revealed a stable appearance of the lumbosacral fusion.  (Tr. 228).  In addition, DePottey underwent MRIs of her lumbar and cervical spine on August 3, 2003.  (Tr. 226-27). The lumbar imaging study showed susceptibility artifacts related to the transpedicular screws, but there was no indication of thecal sac stenosis, disc herniation, or significant neural foraminal compromise.  (Tr. 226).  The cervical imaging study was negative.  (Tr. 227).

DePottey returned to see Dr. Schell on August 8, 2003, complaining of some aggravation of her lumbar spine, as well as neck, shoulder, and arm pain.  (Tr. 217).  Dr. Schell noted that her imaging studies did not demonstrate any further changes; the fusion was "really not good bone fusion" laterally, but she was "doing pretty well."  (*Id.*).  Straight leg raising was negative, she did not walk with an antalgic gait, she had good range of motion of her back, and did not seem to be in too much pain.  (*Id.*).  Dr. Schell further noted that DePottey's neck did not demonstrate any evidence of compression on MRI imaging, and EMG testing revealed only mild carpal tunnel syndrome bilaterally.  (*Id.*).  Dr. Schell suggested that DePottey wear wrist splints, take Vitamin B6, and avoid excessive activities.  (*Id.*).  For her lumbar spine, he recommended a routine walking program to help strengthen the paraspinal muscles.  (*Id.*).  The next day, Dr.

Schell issued a note imposing permanent restrictions on DePottey of no lifting over 30-50 pounds and no excessive bending, twisting, or turning.  (Tr. 219).

There are treatment notes in the record from DePottey's primary care providers at Bayside Community Health Center, covering the period from August 2001 through March 2010. (Tr. 259-321, 479-538, 882-91).   During this time, the doctors report general findings of tenderness in the lumbar spine and cephalgia, and several different pain medications were prescribed.  (*Id.*).  In addition, x-rays performed of DePottey's lumbar spine in February 2006 showed pedicle screws at L5-S1, which appeared to be in good position.  (Tr. 331).

From September 2006 through January 2008, DePottey visited the emergency room on five occasions with complaints of low back pain.  (Tr. 579-620).  At each visit, she was given pain medications and discharged home in stable condition.  (*Id.*).  X-rays were performed of DePottey's cervical spine in July 2007, and the impression was unremarkable.  (Tr. 569).  An EMG was performed in September 2007, which showed moderate right carpal tunnel syndrome and mild left carpal tunnel syndrome.  (Tr. 514).  A note indicates that DePottey was going to contact her primary care physician, Dr. Yong, for a wrist splint.  (*Id.*).  An MRI of DePottey's cervical spine was performed in March 2008, which was essentially negative, with no evidence of spinal stenosis, spondylolisthesis, herniation, or neural foraminal narrowing.  (Tr. 567).

On June 3, 2008, Dr. Yong completed a State of Michigan Medical Needs form, indicating that DePottey had a medical need for assistance with bathing, dressing, mobility, shopping, laundry, and housework.  (Tr. 188).  He opined that DePottey could not work at her usual occupation, but he could not determine whether she could work in other jobs or participate in an employment training program until further testing and therapy was completed.  (*Id.*).

On October 20, 2010, and March 1, 2011, DePottey visited the emergency room at Bay

8

Regional Medical Center, complaining of low back pain. (Tr. 847-60). On both occasions, she was given pain medications and diagnosed with lumbar spasms. (*Id.*). X-rays of DePottey's lumbar spine taken at the March 2011 visit revealed a satisfactory postoperative appearance. (Tr. 861). An MRI of her lumbar spine taken later that month showed postoperative changes of a laminectomy and spinal fusion with interpedicular screws in place at L5-S1, stable grade 1 spondylolisthesis of L5 over S1, severe degenerative disc disease at L5-S1, and mild degenerative disc disease at L4-L5. (Tr. 818).

There are additional treatment notes in the record from Bayside Community Health Center from May 2010 through July 2012. (Tr. 1010-89). During this period of time, there are complaints of back pain and headaches. (*Id.*). The doctors generally report findings of tenderness in the lumbar spine, cephalgia, and mood disorder, and several different medications were prescribed. (*Id.*).

(2)    <u>Consultative and Non-Examining Sources</u>

On October 14, 2006, DePottey underwent a consultative physical examination with Sujeeth Punnam, M.D. (Tr. 425-32). DePottey's complaints included back pain and carpal tunnel syndrome. (Tr. 425). She indicated that she was able to perform her own activities of daily living, including cooking, taking showers, driving, and grocery shopping. (Tr. 425-26). She reported having two or three "attacks" a month, which lasted four or five days each, when her back pain and spasms were so bad that she could barely get out of bed. (Tr. 426). She had difficulty lifting even moderately heavy objects and could not walk very far because of pain. (*Id.*). On examination, DePottey's right grip strength was mildly diminished, and she walked slowly but with no limp. (Tr. 427). She was not able to bend over at all, and she was unable to squat more than ten degrees. (*Id.*). Straight leg raising was positive bilaterally when in a supine

9

position, but she did not have any significant tenderness in the lower back.  (*Id.*).  Dr. Punnam's impressions included back injury contributing to spondylosis with spinal canal stenosis post-surgery, recurrent back spasm and sciatica, and bilateral carpal tunnel syndrome.  (Tr. 428).  Dr. Punnam indicated that the clinical evidence supported the need for a walking aid to reduce pain. (Tr. 430).

On October 26, 2006, a physical residual functional capacity ("RFC") assessment was conducted.  (Tr. 435-42).  Leonard Sheridan, a state agency medical consultant, examined DePottey's medical records and concluded that she retained the ability to occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and that she was not limited in the ability to push or pull.  (Tr. 436). Sheridan further concluded that DePottey could occasionally balance, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, scaffolds, ramps, and stairs; and occasionally engage in fingering (fine manipulation).  (Tr. 437-38).  Sheridan also concluded that DePottey should avoid concentrated exposure to vibration.  (Tr. 439).

On February 7, 2012, after the case was remanded by the District Court, DePottey underwent a second consultative physical examination, this time with Neil Johnson, M.D.  (Tr. 830-40).  Again, DePottey primarily complained of back pain, which radiated down her left leg to the bottom of her feet, and carpal tunnel syndrome.  (Tr. 830).  On examination, DePottey walked with an antalgic gait but did not use an assistive device.  (Tr. 831).  She had severe difficulty getting on and off the exam table and tandem walking, and she could not squat or hop. (*Id.*).  Laying down on the table caused severe pain and made straight leg raising nearly impossible.  (*Id.*).  There was tenderness of the low back but no definite spasm.  (*Id.*).  She was able to button a button, pick up a coin, and open a door.  (*Id.*).  Dr. Johnson diagnosed DePottey

with low back pain, carpal tunnel syndrome, and depression.  (Tr. 833).  He completed a Medical

Source Statement indicating that she could lift and carry up to 20 pounds occasionally; sit for six

hours, stand for four hours, and walk for two hours in an eight-hour workday; was limited to

only occasional handling, fingering, feeling, and pushing/pulling; could never climb ladders or

scaffolds; and could only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and

crawl.   (Tr. 835-38).   Dr. Johnson further opined that DePottey did not require a cane to

ambulate.  (Tr. 836).

(b)   <em>Mental Impairments</em>

The ALJ found that DePottey has the severe mental impairments of affective disorder and

anxiety disorder.  (Tr. 648).  Medical evidence pertaining to these conditions is discussed below.

(1)   <u>Treating Sources</u>

There are treatment notes in the record from DePottey's primary care providers at

Bayside Community Health Center, covering the period from August 2006 through July 2012,

which contain references to DePottey's complaints of depression and anxiety.  (Tr. 25-321, 479-

538, 882-91, 1010-89).  Over this time, DePottey was prescribed several different medications

for these conditions, including Zoloft, Wellbutrin, Soma, and Xanax.  (*Id.*).

On July 30, 2009, DePottey began treating at Saginaw Psychological Services.  (Tr. 906-

10).  At her initial assessment, she reported experiencing panic attacks and depression.  (Tr. 906).

She indicated that she had good social skills and a couple of good friends.  (*Id.*).   On

examination, her mood was depressed, her affect was appropriate, she was fully oriented, and her

memory, judgment, and insight were intact.  (Tr. 908).  She was diagnosed with recurrent, severe

major depressive disorder and panic disorder without agoraphobia, and she was assigned a

11

Global Assessment of Functioning ("GAF")[2] score of 49.  (Tr. 910).

On November 18, 2009, Madhumalit Bhavsar, M.D., performed a psychiatric evaluation. (Tr. 930-32).  DePottey reported suffering from depression for that past five years, saying that it had become worse in the last year because her life was "stressful."  (Tr. 930).  At the time, she was not working, but was taking care of her children and taking online classes for laboratory work.  (Tr. 931).  On examination, her mood was depressed and her affect was constricted, but her speech and thought processes were coherent and relevant, and her memory, judgment, impulse control, and insight were all adequate.  (*Id.*).  Dr. Bhavsar diagnosed DePottey with recurrent, moderate major depression and assigned a GAF score of 60.  (Tr. 931-32).  The records indicate that DePottey continued to receive mental health treatment (therapy and medication) at Saginaw Psychological Services from July 2009 through February 2012.  (Tr. 897-1001).  Over this time, DePottey continued to complain of depression and her medications were managed.  (*Id.*).  Her diagnosis remained major depression, and her GAF scores ranged from 52 to 56.  (*Id.*).

On October 12, 2011, DePottey began treating with Mohammad Jafferany, M.D.  (Tr. 865-66).  At her initial psychiatric evaluation, DePottey reported feeling very depressed and, at times, becoming angry and frustrated.  (Tr. 865).  She felt hopeless, helpless, and worthless and no longer wanted to participate in activities she had enjoyed in the past.  (*Id.*).  She reported problems with sleep, appetite, concentration, and attention.  (*Id.*).  On examination, DePottey was alert and oriented, and her thought process and memory were intact.  (Tr. 866).  Her insight and judgment appeared limited, but her attention and concentration were fair.  (*Id.*).  DePottey

---

[2]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

was diagnosed with bipolar disorder and assigned a GAF score of "around 50." (*Id.*).   In November 2011, DePottey again saw Dr. Jafferany, reporting that, after starting Cymbalta, her pain symptoms had decreased and her mood had improved.   (Tr. 867).   At her next visit, in January 2012, DePottey reported that the Cymbalta helped her a lot, that she had no more pain, and that her mood was better.   (Tr. 868).   On May 30, 2012, Dr. Jafferany completed a "Medical Provider's Assessment of Ability to Do Mental Work-Related Activities."   (Tr. 870-72).   In that assessment, Dr. Jafferany opined that DePottey had marked limitations in activities of daily living and maintaining concentration, persistence, or pace; extreme limitations in maintaining social functioning;[3] and had experienced three episodes of decompensation, each of extended duration.   (Tr. 871).

(2)   Consultative and Non-Examining Sources

On August 1, 2006, DePottey underwent a consultative psychological examination with Heather Cochran, Ph.D., and Mark Zaroff, Ph.D.   (Tr. 399-403).   DePottey reported having chronic back pain, carpal tunnel syndrome, depression, and anxiety.   (Tr. 399).   She denied a history of psychiatric hospitalization, outpatient mental health therapy, or substance abuse treatment.   (Tr. 400).   On examination, DePottey demonstrated appropriate contact with reality, and there were no problems noted with self-esteem, motor activity, or degree of autonomy.   (Tr. 401).   Her motivation was somewhat limited, her insight was adequate, and her mental activity was spontaneous and organized.   (*Id.*).   There was no evidence of disordered thought, and DePottey denied hallucinations, delusions, persecutions, obsessions, feelings of worthlessness, or suicidal ideation.   (*Id.*).   Her mood was euthymic, her affect was broad, and she was

---

[3] Somewhat inconsistently, when asked to characterize DePottey's limitations in certain specific areas, Dr. Jafferany opined that she had no limitations in relating to co-workers or interacting with supervisors, and only mild limitations in dealing with the public.   (Tr. 870).

appropriately oriented to time and place.   (*Id.*).   DePottey was diagnosed with depressive disorder and assigned a GAF score of 59.  (Tr. 403).

On August 14, 2006, Bruce G. Douglass, Ph.D., a state agency medical consultant, reviewed DePottey's records and completed a mental RFC assessment and a Psychiatric Review Technique.  (Tr. 406-22).  Dr. Douglass noted that DePottey suffers from an affective disorder (as defined in Listing 12.04).  (Tr. 406, 409).  He opined that DePottey is mildly limited in her activities of daily living and social functioning; moderately limited in maintaining concentration, persistence, and pace; and had experienced no episodes of decompensation.[4]  (Tr. 416).  Dr. Douglass concluded that DePottey would have some difficulty with complex or detailed tasks, but was able to "perform simple and unskilled tasks on a sustained basis."  (Tr. 422).

On February 10, 2009, Thomas Seibert, LLP, performed an independent learning disability evaluation.  (Tr. 456-75).  DePottey reported that, because of her back injury, she could stand for no longer than one hour, sit for no longer than two hours, and lift no more than 30 pounds.  (Tr. 457).  She further reported suffering from attention deficit hyperactivity disorder ("ADHD") as a child and indicated that poor concentration caused problems for her in school, work, and social settings.  (Tr. 457-58).  Dr. Seibert noted, however, that DePottey's responses to

---

[4] Specifically, in his RFC Assessment, Dr. Douglass opined that DePottey is not significantly limited in the ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and work week without interruptions from psychological symptoms; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them; maintain socially appropriate behavior; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals and make plans independently of others.  (Tr. 420-21).  Dr. Douglass further opined that DePottey is moderately limited in the ability to understand, remember, and carry out detailed instructions, and maintain attention and concentration for extended periods.  (Tr. 420).

the Specific Learning Disabilities Behavior Checklist did not support a diagnostic impression of ADHD. (Tr. 458). On intellectual assessment, Dr. Seibert noted that DePottey was functioning in the average range of intellectual ability, with average reading, spelling, and math skills. (Tr. 471). Dr. Seibert noted that DePottey's verbal IQ skills were at the border between the low-average and borderline categories, supporting the conclusion that she has a "unique information-processing problem." (Tr. 472). Dr. Seibert further opined that DePottey creates a diagnostic impression of a nonspecific communication disorder. (*Id.*). In conclusion, Dr. Seibert stated:

> Based upon intellectual and academic considerations alone, Ms. DePottey appears to be capable of pursuing employment in any of the occupations listed in the test results section. Her multiple physical challenges may prevent her from working in any job. Consideration might be given to having her undergo a work evaluation to determine if her physical limitations – especially her poor stamina and low energy – will permit her to do any competitive employment.

(Tr. 473).

On January 31, 2012, following remand, DePottey underwent a second consultative psychological examination with Mark Zaroff, Ph.D. (Tr. 820-28). At that time, DePottey indicated that she had been working part-time as a bartender (about 10 hours per week), but said she had difficulty making it through "two solid days at work in a row due to the physical demands." (Tr. 820-21). She indicated that she had friends she enjoyed spending time with, and she had been volunteering at the Salvation Army. (Tr. 821). She reported being able to see her children off to school, clean the house, cook, and spend time with her children. (Tr. 822). Dr. Zaroff noted that she appeared to be somewhat anxious and tearful at times during the interview. (*Id.*). On examination, her insight was adequate, and her thoughts were logical, organized, and goal directed. (*Id.*). She reported feelings of worthlessness and hopelessness but denied any suicidal ideation. (*Id.*). Dr. Zaroff diagnosed DePottey with a single episode of moderately severe major depressive disorder and panic disorder without agoraphobia and assessed a GAF

15

score of 49.  (Tr. 824).  On February 3, 2012, Dr. Zaroff completed a Medical Source Statement, in which he opined that DePottey was mildly limited in understanding, remembering, and carrying out complex instructions; making judgments on complex work-related decisions; interacting appropriately with the public, supervisors, and co-workers; and responding appropriately to usual work situations and to changes in a routine work setting.  (Tr. 826-28).

### 4. *Vocational Expert's Testimony*

Michelle Ross testified as an independent vocational expert ("VE") at the administrative hearing before the ALJ.  (Tr. 694-701).  The VE characterized DePottey's past relevant work as semi-skilled in nature and performed at the heavy exertional level.  (Tr. 698).  Then, the ALJ asked the VE to imagine a claimant of DePottey's age, education, and work experience, who could perform light work, with the following additional restrictions:  must have the option to sit/stand at will, as long as she is not off task more than 10% of the workday; frequent grasping, handling, and fingering with the bilateral upper extremities; no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; occasional balancing, stooping, crouching, and kneeling; must avoid all exposure to workplace hazards; must avoid concentrated exposure to temperature extremes and humidity; can perform simple, routine, repetitive tasks with only occasional changes in a routine work setting; and may have only occasional interaction with supervisors, coworkers, and the general public.  (Tr. 698-99).  The VE testified that the hypothetical individual would not be capable of performing DePottey's past relevant work.  (Tr. 699).  However, the VE testified that the hypothetical individual would be capable of working in the positions of machine tender (7,800 jobs in the state of Michigan), line attendant (4,800 jobs), and packager (6,300 jobs).  (*Id.*).

C.    **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing

20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ....  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers

17

to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that DePottey is not disabled under the Act.  At Step One, the ALJ found that DePottey has not engaged in substantial gainful activity since September 1, 2001, the alleged onset date.  (Tr. 648).  At Step Two, the ALJ found that DePottey has the severe impairments of degenerative disc disease, carpal tunnel syndrome, headaches, affective disorder, and anxiety disorder.  (*Id.*).  At Step Three, the ALJ found that DePottey's impairments do not meet or medically equal a listed impairment.  (Tr. 648-50).

The ALJ then assessed DePottey's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional restrictions:  must have the option to sit/stand at will, as long as she is not off task more than 10% of the workday; frequent grasping, handling, and fingering with the bilateral upper extremities; no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs; occasional balancing, stooping, crouching, and kneeling; must avoid all exposure to workplace hazards; must avoid concentrated exposure to temperature extremes and humidity; can perform simple, routine, repetitive tasks with only occasional changes in a routine work setting; and may have only occasional interaction with supervisors, coworkers, and the general public.  (Tr. 650-62).

At Step Four, the ALJ determined that DePottey is unable to perform her past relevant work as a machine maintenance worker.  (Tr. 662).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that DePottey is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 662-63).  As a result, the ALJ concluded that DePottey is not disabled under the Act.  (Tr. 663).

E.        **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human*

*Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

F.    **Analysis**

In her motion for summary judgment, DePottey argues that the ALJ erred in evaluating the medical opinion evidence and in failing to adequately assess the credibility of her subjective complaints.  (Doc. #20 at 6-27)  Each of these arguments will be discussed in turn.

1.    *The ALJ's Evaluation of the Medical Opinion Evidence is Supported by Substantial Evidence*

As an initial matter, DePottey argues that the ALJ erred in evaluating the medical opinion evidence regarding her physical and mental impairments.  Specifically, DePottey asserts that, with respect to her mental impairments, the ALJ erred in failing to give controlling weight to Dr. Jafferany's opinion and in failing to assign weight to the opinion of Dr. Seibert.  (*Id.* at 6-13, 22-23).  Additionally, DePottey argues that, with respect to her physical impairments, the ALJ erred in giving "minimal weight" to the opinion of Dr. Johnson, and in failing to discuss and/or assign weight to the opinions of Dr. Yong and Dr. Punnam.  (*Id.* at 13-21).

(a)    *Mental Impairments*

The ALJ recognized DePottey's mental impairments and accommodated their limiting effects by restricting her to simple, routine, and repetitive tasks with only occasional changes in a

20

routine work setting and only occasional interaction with supervisors, coworkers, and the general public. (Tr. 650). These restrictions are entirely consistent with the February 2009 learning disability evaluation from consulting psychologist Dr. Seibert, the February 2012 assessment from consulting psychologist Dr. Zaroff, and the August 2006 assessment from the state agency reviewing psychologist, Dr. Douglass. (Tr. 406-22, 456-75, 820-28). Specifically, after evaluating DePottey for learning disabilities, Dr. Seibert concluded that she is "intellectually and academically capable of benefiting from either college or advanced vocational training," and intellectually and academically capable of pursuing employment in numerous occupations. (Tr. 469, 472-73). The ALJ gave "significant weight" to this opinion.[5] (Tr. 661). Similarly, after examining DePottey in August 2006 and again in January 2012, Dr. Zaroff concluded that she had no difficulties understanding, remembering, or carrying out simple instructions or making judgments on simple work-related decisions; a mild limitation in social interactions with the public, supervisors, and coworkers; a mild limitation in responding to changes in the work setting; and no other limitations. (Tr. 399-403, 820-28). Moreover, the ALJ's RFC finding is consistent with Dr. Douglass' opinion that DePottey is able to "perform simple and unskilled tasks on a sustained basis." (Tr. 422).

In her motion, DePottey argues that the ALJ erred in failing to give controlling weight to the opinion of her treating psychiatrist, Dr. Jafferany, that she had marked limitations in activities of daily living and maintaining concentration, persistence, or pace, and an extreme

---

[5] DePottey argues that the ALJ should have given significant weight to Dr. Seibert's opinion that she had a communication disorder and should have incorporated into the RFC certain communication-related limitations. (Doc. #20 at 22). As set forth above, however, the ALJ accommodated DePottey's limitations in this respect by restricting her to simple, routine, and repetitive tasks, with only occasional changes in a routine work setting, and only occasional interaction with supervisors, coworkers, and the general public. (Tr. 650). Moreover, the ALJ reasonably discounted Dr. Seibert's speculative statements regarding DePottey's physical limitations because his testing concerned only DePottey's ability to learn. (Tr. 661).

limitation in social functioning.  (Doc. #20 at 6-13).  An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  While treating source opinions are entitled to controlling weight under such circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating physician's opinion controlling weight, she must document how much weight she gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. §404.1527(c).  As such, a decision denying benefits "must contain specific reasons for the weight given to the treating source medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source medical opinion and the reasons for that weight."  *Wilson*, 378 F.3d at 544 (citing *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2)).

Nevertheless, an ALJ is not required to discuss each of the 20 C.F.R. §404.1527(c)

factors in order to satisfy the treating source rule. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that the regulations "expressly require only that the ALJ's decision include 'good reasons'" for the weight given to the treating source's opinion, "not an exhaustive factor-by-factor analysis"). The ALJ's reasons may be "sufficient … [even t]hough brief." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009). In other words, the ALJ may give her reasons in an "indirect but clear" or "implicit[]" manner." *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010); *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006). Indeed, the Sixth Circuit has held that even a one-sentence rejection of a treating physician's opinion can be sufficient to satisfy the "good reasons" requirement. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

DePottey argues that the ALJ "skipped a step in the analysis" in failing to explicitly determine whether Dr. Jafferany's opinion should be given controlling weight. (Doc. #20 at 7). Although DePottey is correct that the ALJ did not explicitly detail her determination in this respect, it is clear from her decision that she declined to give controlling weight to this opinion, and instead gave it "little weight," because it was inconsistent with the medical opinion evidence from Dr. Seibert, Dr. Zaroff, and Dr. Douglass, as well as DePottey's own reports of her daily activities, work ability, and social functioning. (Tr. 660-62). *See Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (treating source opinion entitled to controlling weight only if not inconsistent with other substantial evidence in the case record). As the ALJ noted, DePottey was working part-time in a lounge (sometimes as a bartender), and could perform basic reading, spelling, and math. (Tr. 661). Moreover, contrary to Dr. Jafferany's opinion that DePottey had a marked limitation in activities of daily living, the ALJ noted that she could perform basic activities such as caring for her children, cooking simple meals, shopping, using a computer, and assessing

household needs.  (Tr. 150-54, 660-61, 871).  And, in contrast to Dr. Jafferany's assessment of "extreme limitations" in maintaining social functioning, the ALJ noted that DePottey reported to Dr. Zaroff in January 2012 that she had friends she enjoyed spending time with and had been volunteering at the Salvation Army.  (Tr. 661, 821, 871).  Moreover, Dr. Jafferany's assessment of an "extreme limitation" in social functioning was internally inconsistent, as he indicated on the same form that DePottey had mild to no limitations in interacting with coworkers, supervisors, and the public.  (Tr. 870).  Thus, even if the ALJ erred in failing to explicitly detail the controlling weight analysis, any such error was harmless, as the reasons she articulated for giving little weight to Dr. Jafferany's opinion directly support her implicit decision not to give that opinion controlling weight.[6]  *See Rabbers*, 582 F.3d at 654 (court will not remand unless claimant has been prejudiced on the merits or deprived of substantial rights).

In sum, given that Dr. Jafferany's opinion was internally inconsistent, inconsistent with the opinions of two consultative examiners and the reviewing psychologist, and inconsistent with DePottey's reported daily activities, admitted social functioning, and work history, the ALJ justifiably credited the other medical source opinions regarding DePottey's functioning over that of Dr. Jafferany.[7]

---

[6] DePottey also seems to suggest that the ALJ erred in failing to specifically discuss each of the §1527(c) factors.  (Doc. #20 at 7-9).  However, there is no requirement than an ALJ explicitly detail her consideration of each of these factors.  Rather, the ALJ's articulation need only make clear the weight given to the treating source's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544; *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *5.  Those reasons may be brief or implicit, and the ALJ is not required to undertake a factor-by-factor analysis.  *See Nejat*, 359 F. App'x at 578; *Brock*, 368 F. App'x at 625; *Nelson*, 195 F. App'x at 472; *Allen*, 561 F.3d at 651.

[7] The Sixth Circuit has recognized that opinions from state agency physicians may outweigh treating source opinions in appropriate circumstances, such as the ones just articulated.  *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651-52 (6th Cir. 2006) (affirming ALJ decision adopting opinion of reviewing physician over that of treating source).

*(b)     Physical Impairments*

The ALJ recognized DePottey's physical impairments and accommodated their limiting effects by restricting her to a reduced range of light work.  (Tr. 650-61).  These restrictions are entirely consistent with DePottey's reported daily activities and work activity (as discussed above), her overall treatment records, and her objective test results.  Specifically, after DePottey underwent back surgery in 2001, her surgeon, Dr. Schell, repeatedly indicated that she was making good progress, and imaging studies of her lumbar and cervical spine were essentially normal.  (Tr. 220, 222-23, 226-28, 653).  Dr. Schell recommended a walking routine and assessed permanent restrictions of no lifting over 30-50 pounds and no excessive bending or twisting.  (Tr. 217, 654).  Additionally, the ALJ noted that July 2007 and March 2008 imaging studies of DePottey's cervical spine were normal, and a September 2007 EMG study revealed moderate right and mild left carpal tunnel syndrome.  (Tr. 514, 568-69, 655-56).  A March 2011 MRI of DePottey's lumbar spine revealed a satisfactory postoperative appearance with some degenerative disc disease but no evidence of disc herniation, spinal stenosis, or foraminal stenosis.  (Tr. 658, 818-19).  Finally, the ALJ noted that DePottey was able to complete an exercise stress test in November 2008 despite her allegations of physical limitations.  (Tr. 571, 660).  All of this medical evidence is consistent with the ALJ's limitation to light work with only occasional postural maneuvers.  (Tr. 650).

DePottey argues that the ALJ erred in failing to discuss and assign weight to the June 2008 opinion of her primary care provider, Dr. Yong.  (Doc. #20 at 13-16 (citing Tr. 188)).  As set forth above, however, the only opinion that Dr. Yong actually stated in the Medical Needs certificate relied on by DePottey is that she was unable to work in her usual occupation.  (Tr. 188).  The ALJ's decision was entirely consistent with this opinion, as the ALJ too concluded

that DePottey was unable to perform her past relevant work. (Tr. 662). The remainder of Dr. Yong's June 2008 opinion was that he was unable to assess DePottey's abilities to work in other jobs or to participate in an employment training program until further testing and therapy were completed. (Tr. 188). Thus, even had the ALJ cited and relied on Dr. Yong's "opinion" (that he could not form an opinion), it would not have changed the analysis at all. Moreover, the Commissioner correctly asserts that an ALJ "is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004). Rather, the Sixth Circuit looks at the record as a whole to determine whether the ALJ's decision was based on substantial evidence. *Id.* In this case, the ALJ's decision is supported by substantial evidence in the record, including the bulk of the medical evidence and DePottey's own reports.

DePottey also argues that the ALJ erred in giving "minimal weight" to the opinion of consultative examiner Dr. Johnson, who found that she could perform less than the full range of sedentary work. (Doc. #20 at 16-19 (citing Tr. 661)). An examination of the record, however, reveals that the ALJ reasonably discounted Dr. Johnson's findings – that she could lift no more than 15-20 pounds, walk only two blocks, stand for only 15 minutes, and sit for only 20 minutes – because they were inconsistent with her reported work activities (working primarily on her feet in four-hour increments) and her admitted daily activities. (Tr. 661). Indeed, the ALJ specifically discounted Dr. Johnson's opinion regarding DePottey's limitations because the "doctor's report clearly shows that these limitations were reported to Dr. Johnson by the claimant, and are not the doctor's objective findings." (Tr. 661, 830, 835-38). The Sixth Circuit has held that an ALJ may discount medical opinions that are based on the claimant's own subjective complaints. *See Young v. Sec'y of HHS*, 925 F.2d 146, 151 (6th Cir. 1990); *see also*

26

*Jones v. Comm'r. of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) (even where there is "objective medical evidence of an underlying medical condition … an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."); *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) ("[A] doctor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the opposite of objective medical evidence. [Thus, a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." (internal citations and quotations omitted)). As such, the ALJ did not err in giving only minimal weight to Dr. Johnson's opinion.

Finally, DePottey argues that the ALJ erred in giving an "incomplete summary" of the findings of consultative examiner Dr. Punnam – specifically, in failing to discuss or assign specific weight to his opinion that she needed a walking aid to reduce pain. (Doc. #20 at 20-21 (citing Tr. 430)). Although the ALJ did not explicitly discuss Dr. Punnam's check-box conclusion that the clinical evidence supported the need for a walking aid to reduce pain, this failure does not constitute reversible error because the record as a whole supports the ALJ's implicit conclusion that DePottey did not require an ambulatory aid. *See Simons*, 114 F. App'x at 733 (reviewing court looks at record as a whole to determine if substantial evidence supports the ALJ's decision). DePottey did not testify that she used a walking aid to ambulate. (Tr. 671-98). And, even Dr. Johnson, who rendered an opinion that credited DePottey's subjective allegations and was more restrictive than the ALJ's RFC assessment, reported that DePottey did not require an assistive device to ambulate. (Tr. 831, 836). The ALJ otherwise provided a detailed discussion of Dr. Punnam's examination findings (Tr. 655), and, in light of the substantial evidence supporting her conclusion, her failure to reference his check-box finding

was not prejudicial.

      2.     *The ALJ's Credibility Determination*
                *is Supported by Substantial Evidence*

DePottey also argues that the ALJ erred in failing to "make any finding regarding the credibility of [her] report of the severity of her symptoms." (Doc. #20 at 23). Moreover, DePottey asserts that to the extent the ALJ discounted her credibility, her decision does not "contain 'specific reasons' for the credibility finding, which 'must be significantly specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" (*Id.* at 24 (citing *Soc. Sec. Rul.* 96-7p, 1996 WL 374186, at *1 (July 2, 1996)).

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain or other symptom is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of her symptoms are credible. *Soc. Sec.*

*Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

In this case, after finding at Step Two that DePottey has the severe impairments of degenerative disc disease, carpal tunnel syndrome, headaches, affective disorder, and anxiety disorder (Tr. 648), the ALJ concluded that she has the residual functional capacity to perform a reduced range of light work that involves only simple, routine, and repetitive tasks, with only occasional changes in the work setting, and only occasional interaction with supervisors, coworkers, and the public (Tr. 650). Contrary to DePottey's assertion, the ALJ made a clear credibility determination when she specifically stated that while DePottey's conditions could reasonably be expected to produce the alleged symptoms, her statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with the RFC assessment. (Tr. 660).

In reaching this conclusion, the ALJ specifically considered the fact that DePottey's allegations of additional limitations were internally inconsistent, and were inconsistent with her activities of daily living, work activity, treatment history, and the objective medical evidence. (*Id.*). For example, the ALJ's assessment of DePottey's limitations is entirely consistent with the medical opinions of Dr. Zaroff, Dr. Douglass, and Dr. Seibert, as well as the largely normal imaging studies of DePottey's spine. (Tr. 226-28, 422, 469, 472-73, 568-69, 650, 818-19, 826-28, 861). Moreover, the ALJ noted that DePottey's activities of daily living – which included working part-time and caring for her children – were inconsistent with her allegations of disabling symptoms. (Tr. 660). Although DePottey takes issue with the fact that the ALJ discounted her credibility because of inconsistent statements she made regarding limitations imposed by Dr. Schell (Doc. #20 at 24), this was a valid consideration. *See* 20 C.F.R. §404.1529(c)(4) ("We will consider whether there are any inconsistencies in the evidence and

the extent to which there are any conflicts between your statements and the rest of the evidence ….").  In sum, it was entirely proper for the ALJ to consider all of these factors in evaluating DePottey's credibility, and her credibility determination is supported by substantial evidence. *See* 20 C.F.R. §404.1529(c)(2),(3), and(4).

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [25] be GRANTED, DePottey's Motion for Summary Judgment [17] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: July 25, 2014                        s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 25, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
